# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA,**

    Plaintiff,

  v.                                                                                      Case No. 16-CR-48

**TRULUNDA STENSON,**

    Defendant.

## RECOMMENDATION ON
## DEFENDANT'S MOTION IN LIMINE, ECF NO. 18

In 2013, the Internal Revenue Service began investigating a series of suspicious income tax returns. The investigation eventually revealed that Trulunda Stenson prepared and filed with the IRS approximately 90 false federal income tax returns in the names of various individuals that fraudulently sought the refund of more than $340,000 in federal income taxes. In 2016, Ms. Stenson was charged in federal court with defrauding the IRS, wire fraud, and identity theft.

    Ms. Stenson has moved to exclude the identifications of four witnesses who singled her out as the woman who prepared their (false) tax returns. The United States opposes the motion. For the reasons that follow, the Court finds that the procedures used to identify Ms. Stenson were not so unreliable as to require suppression in this case. The Court therefore will recommend that the district judge deny Ms. Stenson's motion to exclude allegedly suggestive identifications.

I.      **Factual Background**

In 2013, the IRS service center flagged a series of suspicious federal income tax returns. The returns were deemed suspicious because they listed the same address and employer and were filed electronically using the same Internet Protocol address. Subsequent investigation revealed that the returns contained inflated wages and withholdings, which resulted in higher refunds being issued. IRS agents eventually focused their investigation on three suspects: Trulunda Stenson, Lakeisha Adams, and Candice Adams. During the course of the investigation, IRS Special Agents Juli K. Ricchio and Tina Carlson interviewed approximately fifteen individual tax filers. Four of those individuals are at issue here: Iesha Patrick, Shanika Thomas, Marletha Rankins, and Carrie Jewett.

**A. Iesha Patrick**

SAs Ricchio and Carlson interviewed Iesha Patrick at her home on May 8, 2015. *See* Hearing Exhibit 3. Ms. Patrick's boyfriend and mother were present, but they were not substantially involved in the interview. Ms. Patrick indicated that her 2011 income tax return was prepared using TurboTax by a woman who lived on North 35th Street in the City of Milwaukee. She initially stated that she did not know the woman; she had been referred to her by her cousins. Ms. Patrick stated that she went to the 35th Street residence with her boyfriend, discussed claiming her nephew as a dependent, and paid the woman $500 to prepare her return. Ms. Patrick did not indicate where she sat or what she did while the woman prepared her return. SA Ricchio did not ask Ms. Patrick how long the process took, but she

2

estimated, based on her training and experience, that it would take at least thirty minutes to prepare the tax returns at issue here.

When asked if the woman was Trulunda Stenson, Ms. Patrick replied, "That sounds familiar." SA Ricchio then showed Ms. Patrick Wisconsin Department of Transportation photographs of, respectively, Ms. Stenson, Lakeisha Adams, and Candice Adams. *See* Hearing Exhibit A. Each WisDOT record contained other information, including the individual's name and address. SA Ricchio stood a few feet away from Ms. Patrick, held the photos up one at a time—with her thumb on the front and her fingers on the back—and asked Ms. Patrick if she recognized the person in the photo. When shown Ms. Stenson's photo, Ms. Patrick replied, without hesitation, "Yes, she's the one who prepared my tax return."

Ms. Patrick also recognized Lakeisha Adams and Candice Adams. She stated that Lakeisha Adams was present when Ms. Stenson prepared her tax return, but she did not assist in any way. Candice Adams was not present at that time. Ms. Patrick eventually admitted that Ms. Stenson was a family friend, and she knew Candice Adams as Ms. Stenson's sister. She did not, however, elaborate on the nature of her relationship with Ms. Stenson or indicate how many times she had seen Ms. Stenson in the past. Ms. Patrick further indicated that Ms. Stenson prepared tax returns using a computer that was set up on a kitchen table.

According to Ms. Patrick, Ms. Stenson had the IRS place the refund on a debit card, took her $500 fee for preparing the tax return out of the card, and then

3

gave Ms. Patrick the card and the pin number. IRS records, however, showed that the debit card containing Ms. Patrick's refund was not sent to Ms. Stenson's house.

**B. Shanika Thomas**

SA Ricchio first interviewed Shanika Thomas over the phone on May 15, 2015. *See* Hearing Exhibit 5. She informed Ms. Thomas that she had questions about Ms. Thomas's 2011 return. When asked about Trulunda Stenson, Ms. Thomas indicated that the name, or "Nay Nay," sounded familiar. She repeatedly asked to see a picture and claimed to have a photographic memory. SA Ricchio indicated that she would show Ms. Thomas a picture when they met in person.

Ms. Thomas indicated that her friend, Marletha Rankins, referred her to a woman who prepared tax returns and lived on North 35th Street. She had visited the woman with Ms. Rankins when she prepared Ms. Rankins's tax return. Ms. Thomas described the residence as a lower unit right off Center Street, and she believed that there was a corner store and a senior living building under construction nearby.

SAs Ricchio and Carlson interviewed Ms. Thomas at her mother's home on October 28, 2015. Because Ms. Thomas indicated during the phone interview that she would recognize a picture of the woman who prepared her 2011 return, SA Ricchio showed her the WisDOT photos at the outset of the interview. She presented the photos in the same manner as described above. Without hesitation, Ms. Thomas identified Ms. Stenson as the woman who lived on 35th Street and who prepared Ms. Rankins's return. Ms. Thomas further indicated that Candice Adams

4

looked familiar. SA Ricchio does not think she showed Lakesiha Adams's photo to Ms. Thomas.

IRS records revealed that a woman named Brittany Scott prepared Ms. Thomas's 2011 income tax return. Those records also revealed a second 2011 return that someone attempted to file in Ms. Thomas's name. When shown these records, Ms. Thomas appeared confused, so SA Ricchio explained that Trulunda Stenson—the woman Ms. Thomas identified as preparing Ms. Rankins's return—was the same woman who attempted to file Ms. Thomas's second 2011 return.

Ms. Thomas then admitted to going to Ms. Stenson's residence with Ms. Rankins. She acknowledged that she knew Ms. Rankin's return was fraudulent, as Ms. Rankins did not work. Ms. Thomas believed she returned to Ms. Stenson's residence the following day to have her tax return prepared. Ms. Thomas told SA Ricchio that she thought her return was legitimate because, unlike Ms. Rankins, she did have a valid W-2. She did not indicate where she sat or what she did while Ms. Stenson prepared her return. Ms. Thomas indicated that she had not seen Ms. Stenson since the day she prepared her tax return.

### C. Marletha Rankins

SAs Ricchio and Carlson interviewed Ms. Rankins at her home on May 22, 2015. *See* Hearing Exhibit 4. Ms. Rankins indicated that she had not worked in several years and that she did not recall filing an income tax return for 2011. SA Ricchio showed Ms. Rankins a copy of her 2011 return, which listed Uline as her employer and resulted in an $8,000 refund. Ms. Rankins indicated that she never

5

worked at Uline, she did not file the 2011 return, and she did not receive an $8,000 tax refund for that year.

When asked who filed the second 2011 tax return, Ms. Rankins claimed that her wallet had been stolen while she was at a bar. She indicated that she was at the bar with Tasha and Nay Nay. SA Ricchio then showed Ms. Rankins the WisDOT photo of Trulunda Stenson and asked if that was Nay Nay. Without hesitation, Ms. Rankins replied, "Yes." Ms. Rankins stated she knew Ms. Stenson since she was twelve or thirteen years old; they grew up in the same neighborhood. Ms. Rankins also identified Candice Adams from the WisDOT photo, explaining that Candice Adams was Ms. Stenson's sister and was also at the bar the night Ms. Rankins's wallet was stolen. Ms. Rankins indicated that Lakeisha Adams did not look familiar.

On October 16, 2015, SAs Ricchio and Carlson interviewed Ms. Rankins a second time. Ms. Rankins claimed that, after the first interview, she unexpectedly ran into Ms. Stenson. According to Ms. Rankins, Ms. Stenson asked if she had been contacted by someone from the IRS. Ms. Rankins said "yes" and told Ms. Stenson about her first interview with SAs Ricchio and Carlson.

SA Ricchio showed Ms. Rankins bank records that demonstrated she did indeed receive a tax refund for 2011. Ms. Rankins then admitted to lying during her first interview. She made up the story about her wallet being stolen at a bar. Ms. Rankins also lied about knowing Ms. Stenson since childhood. Rather, she knew Ms.

6

Stenson's boyfriend and had met her through him; she had known Ms. Stenson for only a few years.

Ms. Rankins stated that she went to Ms. Stenson's residence on North 35th Street, where Ms. Stenson prepared Ms. Rankins's 2011 return using her laptop computer. Candice Adams was present at that time, but she did not help prepare Ms. Rankins's return. Ms. Rankins indicated that she paid Ms. Stenson $1,500 for preparing her tax return. She did not pay Ms. Stenson until after she received her tax refund. Ms. Rankins believed that Ms. Stenson trusted her because she was friends with Ms. Stenson's boyfriend.

### D. Carrie Jewett

SA Ricchio conducted a phone interview with Ms. Jewett on May 19, 2015. *See* Hearing Exhibit 2. Ms. Jewett indicated that a woman who lived on North 35th Street prepared her income tax returns; she did not remember the woman's name. The woman charged $100 and prepared the returns in her home using a laptop computer that was located on a kitchen table. Ms. Jewett sat on the woman's couch while she prepared the returns. Ms. Jewett stated she did not recognize the names Trulunda Stenson or Candice Adams. She indicated, however, that she would recognize the preparer if she saw a picture. Ms. Jewett agreed to meet with SA Ricchio in person.

The in-person interview occurred on September 2, 2015. SA Ricchio showed Ms. Jewett the WisDOT photos in the same manner as described above. When shown Ms. Stenson's photo—the first photo—Ms. Jewett replied without hesitation,

"Yes, that's her." Ms. Jewett indicated that the name Nay Nay sounded familiar, but she still did not recognize the name Trulunda Stenson. Ms. Jewett stated that Candice Adams looked familiar and may have been at the 35th Street residence while her return was being prepared. Candice Adams did not, however, prepare her tax return. Ms. Jewett did not recognize Lakeisha Adams.

Ms. Jewett indicated that the return was prepared at Ms. Stenson's residence on 35th Street. Ms. Jewett described the residence and the bus route she took to get there. She sat on the couch while Ms. Stenson sat at a kitchen table, using a laptop to prepare the return. Ms. Jewett indicated that other people were present in the residence at the time, including several children. The printer was broken, so Ms. Stenson told Ms. Jewett she would bring a copy of the return when Ms. Jewett paid her the $300 fee.[1] Ms. Jewett described the encounter as happening very fast, as she was in and out of Ms. Stenson's house. Ms. Jewett stated she subsequently met with Ms. Stenson and paid her $300 for preparing the return, but she never received a copy of the return because, Ms. Stenson claimed, the printer was still broken.

## II. Procedural Background

On March 22, 2016, a federal grand jury returned a thirty-four-count indictment against Ms. Stenson. *See* Indictment, ECF No. 1. She is charged with ten counts of submitting to the IRS false, fictitious, and fraudulent income tax returns, in violation of 18 U.S.C. § 287; twelve counts of wire fraud, in violation of 18 U.S.C. § 1343; and twelve counts of identity theft, in violation of 18 U.S.C.

---

[1] Although Ms. Jewett initially claimed that Ms. Stenson charged $100 to prepare her return, she later clarified that the fee was actually $300. *See* Hr'g Ex. 2.

8

§ 1028A(a)(1). The matter is assigned to United States District Judge Pamela Pepper for trial and to this Court for pretrial motions. Ms. Stenson's trial is scheduled for June 26, 2017.

On December 4, 2016, Ms. Stenson filed a motion to exclude the identifications made by Ms. Patrick, Ms. Thomas, Ms. Rankins, and Ms. Jewett. *See* Defendant's Motion in Limine to Exclude Suggestive Identifications, ECF No. 18. The United States has responded to the motion, *see* United States' Response, ECF No. 51, and Ms. Stenson has submitted a reply, *see* Ms. Stenson's June 21, 2017 reply letter, ECF No. 57. The Court held an evidentiary hearing on June 20, 2017, and heard testimony from SA Ricchio. *See* Court Minutes for Evidentiary Hearing, ECF No. 60. At the evidentiary hearing, the Court received into evidence a copy of the WisDOT photos of Ms. Stenson, Lakeisha Adams, and Candice Adams. *See* Hr'g Ex. A. The Court also received into evidence a United States Department of Justice memorandum concerning procedures for conducting photo arrays, *see* Hearing Exhibit 1, and a copy of SA Ricchio's "Memorandum of Interviews" concerning Ms. Patrick, Ms. Thomas, Ms. Rankins, and Ms. Jewett, *see* Hr'g Exs. 2–5.

### III. Discussion

Ms. Stenson seeks to exclude the out-of-court identifications made by Ms. Patrick, Ms. Thomas, Ms. Rankins, and Ms. Jewett, arguing that the method used by SA Ricchio was unduly suggestive. Ms. Stenson also seeks to prevent those four witnesses from identifying Ms. Stenson during the trial due to the taint created by the improper out-of-court identifications.

9

### A. Legal standard

"The Constitution . . . protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit." *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012). These constitutional safeguards include the "right to counsel," "compulsory process," and "confrontation plus cross-examination of witnesses." *Id.* (citations omitted). Suppression, therefore, is required "[o]nly when evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice.'" *Id.* (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)).

In applying that standard to eyewitness identification evidence, courts must engage in a two-part analysis. The court must first determine whether the identification procedure used by law enforcement was "both suggestive and unnecessary." *Perry*, 565 U.S. at 238–39 (citing *Manson v. Brathwaite*, 432 U.S. 98, 107 (1977)). An affirmative answer, however, does not automatically result in the evidence being excluded. Rather, under the second part, suppression is appropriate only if the procedure "created a 'substantial likelihood of misidentification.'" *Perry*, 565 U.S. at 239 (quoting *Neil v. Biggers*, 409 U.S. 188, 201 (1972)).

Put another way, evidence derived from a suggestive process may still be admissible if, based on the totality of the circumstances, the eyewitness identification is, in the end, reliable. *See Perry*, 565 U.S. at 239 (citing *Brathwaite*, 432 U.S. at 110, 114). The evidence should be suppressed only if "the 'indicators of

[a witness'] ability to make an accurate identification' are 'outweighed by the corrupting effect' of law enforcement suggestion." *Perry*, 565 U.S. at 239 (quoting *Brathwaite*, 432 U.S. at 114). "Otherwise, the evidence (if admissible in all other respects) should be submitted to the jury." *Perry*, 565 U.S. at 239.

In evaluating a witness' ability to make an accurate identification, courts typically consider (1) the witness's opportunity to view the suspect at the time of the alleged crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the suspect; (4) the witness's level of certainty at a subsequent confrontation; and (5) how much time elapsed since the alleged crime and the confrontation. *See Biggers*, 409 U.S. at 199–200.

Unreliable out-of-court identifications can sometimes taint a subsequent in-court identification. Accordingly, an in-court identification following an unreliable out-of-court identification "is inadmissible unless it is so reliable, in view of the totality of the circumstances, as to prevent a substantial likelihood of misidentification." *United States v. Rutledge*, 40 F.3d 879, 889 (7th Cir. 1994) (citing *Brathwaite*, 432 U.S. at 107–14), *rev'd on other grounds*, 517 U.S. 292 (1996). The admissibility of in-court identifications therefore is judged based on the same factors identified in *Biggers* above. *See Cossel v. Miller*, 229 F.3d 649, 655 (7th Cir. 2000).

**B. Legal analysis**

According to Ms. Stenson, the procedure used to identify her was "massively suggestive." Def.'s Reply 1. SA Ricchio asked each witness if she recognized the

name Trulunda Stenson and then showed the witness a photo of Ms. Stenson with her name printed above it. Ms. Stenson argues that this procedure fell far below the DOJ's "best practices" for conducting photo arrays. Def.'s Mot. 4–7; Def.'s Reply 1–2. For example, SA Ricchio did not use any "filler" photographs of non-suspects (only a few witnesses were also shown photos of Lakeisha Adams and Candice Adams, neither of whom, according to Ms. Stenson, resemble her), did not inform the witnesses that the woman who prepared their tax returns may not be in the photos, never asked for a description of the woman, and knew who was depicted in each photo. Ms. Stenson further argues that there were no exigent circumstances justifying such a procedure. Def.'s Mot. 4.

The Court is skeptical whether, as Ms. Stenson suggests, SA Ricchio should have followed the DOJ's best practices in this case. Those methods are necessary to prevent suggestion when a witness is asked to identify a stranger following a high-stress encounter, not for acquaintances who meet to exchange documents. Indeed, the DOJ memorandum relied upon by Ms. Stenson specifically includes the following disclaimer: "A 'photo array' is distinct from other law enforcement techniques involving photographs used to obtain investigative leads, such as 'mug books' *and single confirmatory photographs*, which are outside the scope of this memorandum." Hr'g Ex. 1 p. 1 n.1 (emphasis added).

The Court nevertheless finds that the procedure used by SA Ricchio was arguably suggestive. SA Ricchio showed Ms. Rankins the photo of Ms. Stenson after Ms. Rankins mentioned Ms. Stenson's nickname, Nay Nay. With respect to the

others, SA Ricchio asked each witness if she knew the name Trulunda Stenson and then showed each witness the three WisDOT photos. Ms. Stenson's was the first photo, and her name was displayed on the document. This procedure may have suggested to the witnesses that the pictured Ms. Stenson was the person the IRS was seeking.

The procedure also was unnecessary. The interviews occurred years after the investigation began. Moreover, SA Ricchio acknowledged that she had time, if she so desired, to prepare a "better" photo array. As there were no exigent circumstances justifying the process used here, the Court will proceed to the second part of the analysis.

Based on a review of all the evidence, the Court finds that the procedure used by SA Ricchio did not create a substantial likelihood of misidentification. All four witnesses unequivocally stated that the woman who prepared their tax returns lived on North 35th Street. All four witnesses described the interior set-up of the dwelling used by their tax preparer: the woman prepared the returns using a laptop computer while sitting at a kitchen table. Ms. Thomas also described the surrounding neighborhood, and Ms. Jewett remembered the route she took to get there. SA Ricchio interviewed Ms. Stenson twice at the North 35th Street residence, and she corroborated the location and dwelling details provided by the witnesses.

Furthermore, all four witnesses unequivocally identified Ms. Stenson as the woman who prepared their tax returns. SA Ricchio asked the four witnesses if they recognized the woman depicted in the photo, and each witness identified Ms.

Stenson without any hesitation whatsoever. Accordingly, it appears the witnesses focused exclusively on the photo, not on the other information contained on the WisDOT record. It therefore seems highly unlikely that any of the witnesses picked out Ms. Stenson based on the name supposedly "planted" by SA Ricchio.

The identifications contained other indicia of reliability. Ms. Rankins clearly had a prior relationship with Ms. Stenson, whether she had known her since childhood or for only the last few years. She was friends with Ms. Stenson's boyfriend, she knew Ms. Stenson's nickname (Nay Nay), she "unexpectedly" ran into Ms. Stenson following the first IRS interview, and Ms. Stenson did not require her to pay the preparer's fee upfront. Likewise, Ms. Patrick eventually admitted that Ms. Stenson was a family friend, and she knew that Candice Adams was Ms. Stenson's sister. Although there is no evidence that either Ms. Thomas or Ms. Jewett had a prior relationship with Ms. Stenson, those two witnesses provided the most thorough description of the encounter, the details of which were corroborated by SA Ricchio. Moreover, the low-stress, personal nature of the encounter—exchanging Social Security numbers, W-2s, and other identifying information—bolsters the reliability of all four witnesses' identifications.

Additionally, the evidence demonstrates that it is highly unlikely that the witnesses mistakenly identified Ms. Stenson in place of one of the other suspects, Lakeisha Adams and Candice Adams. Ms. Stenson acknowledges that the three individuals do not look so similar that they could be easily confused for one another. *See* Def.'s Mot. 2, 6; *see also* Hr'g Ex. A. More importantly, Ms. Patrick recognized

14

Lakeisha Adams and Ms. Rankins and Ms. Jewett recognized Candice Adams as being present at the North 35th Street residence, but they clearly indicated that Ms. Stenson was the one who prepared their returns. Ms. Thomas, who was at the residence on two occasions and who claimed to have a photographic memory, identified Ms. Stenson right away. She said that Candice Adams only looked familiar, and she was not shown Lakeisha Adams's photo.

In determining whether an eyewitness identification is reliable, the Court must consider the "totality of the circumstances." The five factors originally set out in *Briggers* are helpful in guiding this analysis, but they are not, as Ms. Stenson seems to suggest, the only factors the Court may consider. Nevertheless, a brief examination of those factors does not demonstrate that the identifications at issue are so unreliable that they should be kept from the jury.

The first two factors, the witness's opportunity to view the suspect and degree of attention, support the reliability of the identifications. All four witnesses either had a prior relationship with Ms. Stenson or spent at least thirty minutes in her home. Although some of the witnesses did not specify what they did while their returns were being prepared, the nature of the visit suggests sufficient interaction between each witness and Ms. Stenson. Although the third factor seems inapplicable in this case because the witnesses did not provide a description of the suspect prior to being shown the WisDOT photos, all four witnesses did accurately describe Ms. Stenson's residence. The fourth factor strongly suggests that the identifications were reliable. Each witness identified Ms. Stenson's photo without

15

any hemming or hawing. The identifications did occur years after the alleged incident and, thus, the fifth factor detracts from their reliability. Given the above-mentioned indicia of reliability, however, the Court finds the lapse of time not so overpowering as to keep such relevant information from the jury.

In sum, the Court finds that the out-of-court identifications challenged here are sufficiently reliable notwithstanding the arguably suggestive and unnecessary procedure used by SA Ricchio. Suppression of the identifications would be too harsh a remedy. The four witnesses will testify at trial and be subject to cross-examination by able defense counsel. Ms. Stenson therefore retains a means of persuading the jury that the identifications "should be discounted as unworthy of credit." *See Perry*, 565 U.S. at 237. Because the out-of-court identifications are reliable, there is no basis to exclude the witnesses' in-court identifications. *See Rutledge*, 40 F.3d at 889 (noting that the two-part test governing the admissibility of in-court identifications requires courts to first "determine whether the initial out-of-court identification was unduly suggestive").

## IV. Conclusion

For all the foregoing reasons, the Court recommends that Judge Pepper deny Ms. Stenson's motion.

**NOW, THEREFORE, IT IS HEREBY RECOMMENDED** that Trulunda Stenson's Motion in Limine to Exclude Suggestive Identifications, ECF No. 18, be **DENIED**.

**IT IS FURTHER RECOMMENDED** that Ms. Stenson's request in the alternative to reserve ruling on this issue for trial, *see* Def.'s Reply 3, ECF No. 57, be **DENIED** for the reasons stated herein.

Your attention is directed to 28 U.S.C. § 636(b)(1)(B) and (C), Fed. R. Crim. P. 59(b), and E.D. Wis. Gen. L. R. 72(c), which provide that any party may file and serve written objections to any proposed finding or recommendation herein, or part thereof. Although objections ordinarily must be filed within fourteen days after being served with a copy of the Recommendation, the Court may set alternative deadlines. *See* Fed. R. Crim. P. 59(b)(2) and E.D. Wis. Gen. L. R. 72(c). Accordingly, objections are due by **noon on Friday, June 23, 2017**. Objections are to be filed in accordance with the Eastern District of Wisconsin's electronic case filing procedures. Failure to file a timely objection with the district judge shall result in a waiver of your right to appeal. **Responses to objections shall be filed only at the request of the Court**.

Dated at Milwaukee, Wisconsin, this 22nd day of June, 2017.

**BY THE COURT:**

*s/ David E. Jones*
DAVID E. JONES
United States Magistrate Judge
