UNITED STATES OF AMERICA,                  Case No. 16-cr-48-pp

         Plaintiff,

v.

TRULUNDA STENSON,

         Defendant.

**ORDER OVERRULING DEFENDANT'S OBJECTION TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION (DKT. NO. 62), ADOPTING THE REPORT AND RECOMMENDATION (DKT. NO. 61), AND DENYING THE MOTION *IN LIMINE* SEEKING SUPPRESSION OF THE OUT-OF-COURT IDENTIFICATIONS (DKT. NO. 18)**

On December 4, 2016 (two weeks before the originally-scheduled trial date of December 19, 2016), the defendant filed a motion *in limine*, asking the court to exclude all evidence of the out-of-court identifications of the defendant by Carrie Jewett, Iesha Patrick, Marletha Rankins and Shanika Thomas. Dkt. No. 18.[1] The motion also asked the court to hold a hearing on whether these same witnesses ought to be able to make an in-court identification of the defendant at trial. Id. at 10.

---

[1] Normally the defendant would have filed this motion as a pretrial motion to suppress. The minutes of the final pretrial conference on June 8, 2017 provide some insight into why it was filed as a motion *in limine*, dkt. no. 45; regardless, the court has treated it as a pretrial motion, referring it first to Magistrate Judge Jones for an evidentiary hearing, report and recommendation, then allowing any party wishing to do so to object. Given the impending trial date and the calendars of the court and the parties, the deadlines for holding the hearing, issuing the report and recommendation, and filing objections were extremely truncated.

On June 20, 2017, Magistrate Judge Jones held an evidentiary hearing on the motion. Dkt. No. 60. On June 22, 2017, he issued a report, recommending that this court deny the motion to suppress. Dkt. No. 61. Defendant Stenson has timely objected to the recommendation. Dkt. No. 62.

Judge Jones' decision details the relevant facts, so this court will be brief. The grand jury charged the defendant in a thirty-four count indictment with filing false claims for tax refunds, devising and participating in a scheme to defraud the IRS by means of false pretenses and representations, and identity theft. Dkt. No. 1. The charges stem from allegations that the defendant prepared false and fraudulent tax returns, seeking refunds to which she or the person named in the return was not entitled. In connection with its investigation of the allegations, the IRS interviewed four individuals whose names had appeared on the fraudulent returns—Jewett, Patrick, Rankins and Thomas. All four identified the defendant as having been the person who prepared their taxes. The defendant argued in the motion, however, that the identifications resulted from a suggestive process, and thus were not reliable. Judge Jones agreed that the process the interviewing agent used was "arguably suggestive." Dkt. No. 61 at 12. But he concluded that the procedure the agent used "did not create a substantial likelihood of misidentification." Id. The court concurs.

The defendant agrees with Judge Jones that the procedure the IRS agent used was suggestive—she states that "[t]hat conclusion is beyond dispute." Dkt. No. 62 at 1. She argued that the agent "ignored" "[n]early every rule or

best practice that applies to photo lineups." Id. To the extent that, out of context, showing a witness a single photo of a person and saying, "Is this the person who committed the crime?" is suggestive, this court agrees.

The court reads Judge Jones' report to say, however, that the context matters. Imagine this context: an individual walks into a bank and gets into the teller line. When her turn comes at the counter, she pulls a gun from her bag, points it at the teller's face, and demands all of the money in the drawer. In the space of seconds, the terrified teller looks down, opens the drawer, pulls out all the money while pushing the duress alarm, and hands the money to the individual—all the while, looking at his fellow tellers and the bank customers and the gun three inches from his face. After the fact, he tells the police that the suspect was a woman, medium height, very skinny, had either dark blonde or brown hair and wore glasses. If the investigating officer took a single photo of a 5'3", skinny, brown-haired woman and showed it to the teller, saying, "I know she isn't wearing the glasses, but is this her?," it is highly likely that the teller would identify that woman as the woman who robbed him. He saw the defendant for seconds, under extreme duress and less than ideal circumstances for making a good identification. In that scenario, showing the teller a single photo of a person who bears some of the physical characteristics the teller remembered is substantially likely to result in misidentification.

In contrast, imagine the context in which Agent Ricchio interviewed Iesha Patrick on May 8, 2015. Dkt. No. 61 at 2. The interview took place in Ms. Patrick's home, with people she trusted knew. She told Agent Ricchio that the

3

woman who prepared her tax return lived on North 35th Street. She indicated that she'd been to the person's house for preparation of her return. True, the agent gave Ms. Patrick a name—she asked if the woman who prepared Ms. Patrick's taxes was Trulunda Stenson. Ms. Patrick said that the name sounded familiar (as it turns out, it wasn't just familiar—Ms. Patrick eventually admitted that she and the defendant were family friends). Agent Ricchio then showed the Ms. Patrick a picture of the defendant, a picture of Lakeisha Adams, and a picture of Candice Adams (each photo had additional information, including the individual's name and address). Despite being shown three photos, Ms. Patrick "replied, without hesitation, 'Yes, she's the one who prepared my tax return,'" referring to the photo of the defendant. Id. at 3. Ms. Patrick went even further—she identified Lakeisha Adams as having been present when the defendant prepared her tax return, and stated that Candice Adams, whom she knew to be the defendant's sister, was not present. Id.

So—unlike the bank teller, Ms. Patrick had a pre-existing relationship with the defendant. Unlike the teller, Ms. Patrick's opportunity to observe the defendant was not limited to a few fleeting seconds, under circumstances of extreme duress. Ms. Patrick *knew* Ms. Stenson (and Lakeisha and Candice Adams) personal—knew their relationships to each other, where the defendant lived. Given Ms. Patrick's prior knowledge of the defendant, and the circumstances under which she interacted with the defendant, there was little likelihood that being shown only one photo (and in this case, Ms. Patrick was shown three) would create a substantial likelihood of misidentification. In fact,

4

this circumstance, where the witness knows the person the agents are investigating, the witness is in a better position than the bank teller to correct a misidentification. Here, for example, Ms. Patrick clarified that while Lakeisha Adams was present during the tax return preparation at the defendant's house, Candice Adams was not. Ms. Patrick knew that Candice Adams (whom she identified as the defendant's sister) was not the person who had prepared her returns, and she knew that Lakeisha Adams was not involved in the preparation of the returns. This was not a situation in which the agent's methods told Ms. Patrick who she should identify.

So the context matters, and the context in which Agent Ricchio showed the defendant's picture to each of the four witnesses was similar to Ms. Patrick's—each witness had seen the defendant before, each had some knowledge of her before the identification interview, and each had had an opportunity to observe her in a relatively stress-free setting.

The defendant argues that Judge Jones' recommendation ignores the fact that each of the witnesses has credibility problems. Id. at 2. She argues, for example, that Marlene Rankins first told the agents a "whopper of a story" about how the defendant had stolen her identity and how she and the defendant had known each other since childhood, then recanted and said that she didn't know the defendant as well as she'd first indicated. The defendant expresses puzzlement that Judge Jones would have accepted as true Rankins' second version of events, rather than the first. Id.

As an initial matter, the court does not share the defendant's bewilderment regarding which story Judge Jones found more credible. Ms. Rankins' first story—that she'd known the defendant for years, that the defendant had stolen her wallet in a bar, that she didn't recall filing a tax return in 2011—was self-serving and self-protective. The second version, in which Ms. Rankin admitted that she had made up the story about the stolen wallet, had made up how long she'd known the defendant, and had admitted that the defendant had prepared her 2011 return—was inculpatory. Dkt. No. 61 at 6-7. There is a reason that Fed. R. Evid. 804(b)(3) provides an exception to the hearsay rule for an unavailable witness' statement when the statement was "so contrary to the declarant's proprietary . . . interest . . or had so great a tendency to . . . expose the declarant to civil or criminal liability." It is because the rules assume that a person would not give a statement inculpating herself unless it were true. Between Ms. Rankins' story that her wallet was stolen and she had no idea how a tax return got filed for her, and her story that she had lied and that the defendant had prepared a return for her, Judge Jones found more credible Ms. Rankin's statements against her own interest.

More to the point, the defendant's argument about the witness' credibility are of a different nature from the argument she made in her motion. The motion to exclude the identifications argues that the witnesses may have identified the wrong person because the agent's process was suggestive. The objection's argument that the witnesses are liars amounts to an argument that

6

the witnesses identified the wrong person because they are liars, not because the identification process misled them into picking the wrong person.

The defendant will have the opportunity to cross-examine each of these witnesses at trial. The court anticipates that her counsel will point out all of the credibility problems (and any that may arise during trial testimony). The defendant is free to argue, if she chooses to do so, that these witnesses lied when they told Agent Ricchio that the defendant had prepared their taxes. But the court will not suppress the out-of-court identifications on that basis.

The defendant also argues that Judge Jones erred in concluding that each of the four witnesses had had a good opportunity to view the defendant. Dkt. No. 62 at 3. She refers the court to the Seventh Circuit's decision in United States v. Traeger, 289 F.3d 461, 474 (7th Cir. 2002), which recounted the five factors the Supreme Court has laid out for courts to use in evaluating whether a witness had the ability to make an accurate identification: the witness' opportunity to view the defendant at the time of the crime, the witness' degree of attention, the accuracy of any prior description the witness may have given of the defendant, the witness' level of certainty at the time of the suspect identification, and the length of time elapsed between the crime and the date of identification. (Citing Neil v. Biggers, 409 U.S. 188, 199-200 (1972)).

The defendant argues that Judge Jones had no information that each witness had ample opportunity to observe the defendant—there was no testimony regarding how long each witness observed her or whether they looked her in the face. Dkt. No. 62 at 3. She argues that there is no evidence

7

about how long each witness had known the defendant—how many times each witness had spoken with her, whether they socialized with her, how long their encounters with her were. Id. at 4. The defendant argues that there was no testimony about how much attention each witness paid to the defendant, noting that in this day of smart phones, many people don't pay attention to others. She also argues that none of the witnesses gave a verbal description of the defendant before they identified her. They may have described her house and her neighborhood, but not *her*. And the defendant argues that the agent never asked any of the witnesses how sure they were of their identifications at the time they made them. Id. at 4-6.

    The court disagrees that Judge Jones had no information on any of these factors. The agent did testify that the witnesses unhesitatingly and unequivocally identified the defendant. Some of them discussed her role in preparing their taxes in relation to the roles of Candice Adams and Lakeisha Adams, showing that the witnesses were distinguishing between the defendant and others. The photos of the three women had their names on them, yet there were witnesses who identified the photo of the defendant, but called her by a nickname. Two of the witnesses had pre-existing relationships with the defendant—regardless of whether they saw her every five years, or every month, or every week, they testified that she was someone that they knew. Whether each witness spent ten minutes with the defendant while she prepared their taxes, or thirty, they were with her under stress-free circumstances. There may have been, as the defendant argues, distractions

8

present—phones, kids, other people. But the witnesses were not so distracted that they could not, for example, make clear that it was the defendant, and not Candice Adams or Lakeisha Adams, who prepared their paperwork. Judge Jones did have information on many of these factors.

Again, however, the bigger issue is context. Simply recounting the Biggers factors demonstrates that they relate to situations in which a witness must identify a person they don't already know. The factors assume that the first time the witness observed the defendant was during a criminal encounter. So, in suggesting that courts consider whether the witness had a good opportunity to observe the defendant, they imply that the court should ask questions like: Was it dark out, or light? Did the encounter last two seconds, or two hours? Was the defendant moving, or stationary? These questions are less relevant in a situation where the witness had seen the defendant before the date of the crime. The same is true of the degree of attention the witness paid. A witness who observed a defendant fleeing through a parking lot might give that defendant only a glance, compared to a witness who watched a defendant go back and forth from the house to the car six times over the course of an hour. But a witness who knew the defendant before the crime doesn't need to pay close attention to the person she already knows to confirm that it's the person she knows. Judge Jones acknowledged that the third Biggers factor— whether the witnesses had provided an accurate description of the defendant prior to the identification date—was not relevant; this court agrees. The degree of certainty factor again supports Judge Jones' finding; it is much easier to

9

identify with certainty someone you know than it is to identify a stranger whom you've seen only once. Judge Jones also acknowledged that the witnesses identified the defendant years after the crimes were committed, but again, this factor is more relevant where a witness is asked to identify a stranger. The passage of years may dull a witness' memory of someone she saw only once, under duress. The passage of time also may dull a witness' memory of specific details of a contact with someone they already knew, but not their memory of the person's identity.

In sum, the court agrees with Judge Jones' conclusions, and accepts his recommendation.

The court **OVERRULES** the defendant's objection to Judge Jones' report and recommendation. Dkt. No. 62.

The court **ADOPTS** Judge Jones' Report and Recommendation. Dkt. No. 61.

The court **DENIES** the defendant's motion *in limine* to exclude the out-of-court identifications of the defendant by Iesha Patrick, Shanika Thomas, Marletha Rankins and Carrie Jewett. Dkt. No. 18.

Dated in Milwaukee, Wisconsin this 23rd day of June, 2017.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**United States District Judge**